In the Matter of Ernestine W. HUNT, for a Writ of Habeas Corpus.

Civ. A. No. 30346.

United States District Court
E. D. Michigan, S. D.

Oct. 25, 1967.

**113**

Clark Shanahan, Owosso, Mich., and B. J. George, Jr., Ann Arbor, Mich., for petitioner.

Frank Kelley, Atty. Gen. of Mich., by Robert Deitrick, Asst. Atty. Gen., Carl Waag, Asst. Pros. Atty., Pima County, Ariz., amicus curiae, Marjorie F.

McGowan, Detroit, Mich., Asst. Legal Advisor to Governor George Romney.

## OPINION AND ORDER

TALBOT SMITH, District Judge.

In this case we must consider the application of the "Great Writ"[1] in the most delicate of circumstances, involving the relationship of a lower Federal Court to the legal process of a sovereign state. Arizona has tried the petitioner, on a felony charge, in absentia, (a procedure permitted by Arizona law) and has convicted her. She is in Michigan, before this Court, her extradition having been requested and ordered. She argues that such a trial has not afforded her due process, and if she is returned to Arizona all that remains is to sentence her. In opposition it is urged that this Court need not consider what has happened heretofore in Arizona, indeed that upon the authority of Sweeney v. Woodall, 344 U.S. 86, 73 S. Ct. 139, 97 L.Ed. 114, reh. den. 344 U.S. 916, 73 S.Ct. 332, 97 L.Ed. 706 (1952), reversing 194 F.2d 542 (CA 6, 1952)[2] it is not our concern. Such are the outlines of the controversy. There are no disputed facts, save possibly what may happen in Arizona, if she is returned there. The issues presented are of law.

In more detail, what happened was this: On January 13, 1964, in the State of Arizona, Ernestine W. Hunt and her husband, Maurice, were charged with aggravated assault and battery, and contributing to the delinquency of their five year old adopted daughter.

The defendants were tried, convicted, and appealed. Their convictions were reversed (pre-trial publicity played a part) and the cause remanded for new trial. While at liberty on appeal bond the petitioner and her husband absented themselves from Arizona and established residence in Michigan. This was a voluntary departure, in the sense that it

---

1. Brennan, J., in Fay v. Noia, 372 U.S. 391, 411–412, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963).

2. The discussion of this case and its antecedents found in 74 Yale L.J. 78 has been particularly helpful.

was volitional, and, although the Arizona court was aware thereof,[3] no steps were taken to return her to the jurisdiction, or to forfeit her bond, until the proceedings hereinafter described. (We will interject at this point that upon such showing we cannot find, without more, that this was a "waiver" of her rights as to all which followed.) The cause was set and re-set for trial, petitioner requesting various delays, but she was finally ordered to appear for trial. This she failed to do. Bench warrants were thereupon issued and the forfeiture of her bond taken under advisement.

On March 23, 1967, petitioner was arrested on a fugitive warrant in the City of Ann Arbor and bail set. On April 10 extradition papers were forwarded by Arizona (she had refused to waive extradition) and received by Michigan's Governor. (Further details as to the extradition process will be discussed *infra*). On April 25, 1967 petitioner's trial in absentia was begun in Arizona and a jury verdict of guilty returned.[4] She is now awaiting sentence in Arizona and it is sought to return her for such purpose. We have required exhaustion of this state's process[5] before considering the merits of the writ. Prior hereto, we have held two preliminary hearings, denied a motion for transfer, issued certain rulings with respect to the hearing on the merits now

concluded, have held pre-trial conferences and have executed a pre-trial order.

We will consider at the outset the validity of the extradition hearings. Extradition, as we have heretofore held, is a Federal matter and the Federal courts have the power to determine whether a person is detained by authority of the United States. The basic authority therefor is found in Article 4, Sec. 2, Cl. 2, of the Constitution of the United States.[6] The implementing Federal statute is found in 18 U.S.C.A. Sec. 3182. (See, also, the Uniform Extradition Act, C.L.1948, Sec. 780.12, Mich.Stat.Ann. Sec. 28.1285(12))

The main thrust of petitioner's attack upon the extradition proceedings conducted by the Governor of Michigan, resulting in the Governor's authorization of return, rests upon a change in petitioner's legal status. At the time the Governor of Arizona made requisition he did so on the ground (covering letter of Gov. Jack Williams, dated March 31, 1967) that Petitioner "stands charged with the crime of Aggrevated (sic) Assault and Battery, a felony", and thus was to be returned for trial, a purpose also made clear in a communication from William J. Shafer, III, County Attorney of Pima County, Arizona, dated March 13, 1967.

3. Testimony of Attorney D'Antonio before this Court, Tr. pp. 21–23.

4. "Rule 231. Proceedings at which presence of defendant required in felony prosecution; exception.
   A. In a prosecution for a felony the defendant shall be present:
   1. At arraignment.
   2. When a plea of guilty is made.
   3. At the calling, examination, challenging, impaneling and swearing of the jury.
   4. At all proceedings before the court when the jury is present.
   5. When evidence is addressed to the court out of the presence of the jury for the purpose of laying the foundation for the introduction of evidence before the jury.
   6. At a view by the jury.

7. At the rendition of the verdict.
   B. If the defendant is voluntarily absent, the proceedings provided by this Rule, except those in paragraphs 1 and 2 of subsection A, may be had in his absence if the court so orders."

5. See, Opinions of Court of Appeals, in the Matter of Ernestine W. Hunt, Plaintiff, No. 4030, Aug. 29, 1967; Supreme Court of Michigan, No. 51871, dated Sept. 7, 1967.

6. "A person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and can be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime."

Nevertheless, on April 25, 1967 the Superior Court of Pima County, over objection (as discussed *infra*) and with knowledge by such Court, the County Attorney, and Defense Attorney, that extradition proceedings were pending, ordered in accordance with Arizona's Rule 231, that an in absentia trial proceed, which it did, conviction resulting. Thus at the time, May 24, when the Governor of Michigan advised Petitioner's counsel that the agent's authorization (to return Petitioner to Arizona on the ground that she "stands charged" with the aforedescribed felony), would issue, and that Arizona's extradition request would be honored, Petitioner had, to Michigan's knowledge, already been tried and convicted in absentia, and thus could not be returned for trial. She could only be returned for sentencing.

The State of Michigan argues that the documents forwarded to the Michigan Governor's office on April 10, 1967, adequately reflected the status of the charges against Petitioner on such date and that nothing in the Uniform Criminal Extradition Act [7] requires, or even suggests, that an extradition request, proper when filed, need be amended to reflect a subsequent change in the legal status of the fugitive in the demanding state, that, indeed, Petitioner was still "charged" with the described felony in the demanding state, since she had not yet been sentenced.

■ Further arguments, pro and con, are made by the parties but we will not exhaust them in view of the circumstance (which we find to be a fact) that the Governor's extradition hearing took cognizance of Petitioner's change of status and that the proceedings were conducted in the light thereof. It would have been a more perfect procedure, technically, to have required a formal amendment, but we find no prejudicial error in what was done.

We have previously ruled that we will consider in this hearing the procedures complained of with respect to Petitioner's trial in absentia in the State of Arizona. Respondent vigorously protests, asserting, primarily upon the authority of the *Sweeney* case, supra, that we cannot look beyond the adequacy of the demand, the content of the instruments submitted. There is something, we concede, to be said for this point of view. It simplifies the task of the asylum state and the courts thereof, both state and Federal therein, as well as avoiding acerbic and demeaning controversies between jurisdictions. Yet before us is a woman charged with a serious offense, tried in absentia while she was in confused mental state,[8] and it is our order, in effect, returning her for sentencing, which is sought. This court cannot agree that it must close its eyes to what has gone before, which is the basis, indeed, for what lies ahead, or that we may not apply recognized constitutional principles to her situation. The essential question for this court, involves Arizona's attempted utilization of the Federal extradition procedures. Are they sought to be employed, as petitioner asserts, to inflict irreparable harm upon her? Or, as respondent asserts, is this a matter foreclosed to our consideration if the papers are in order?

At the outset we will observe that it was not too many years ago that such considerations as the future of the petitioner in the demanding state (e. g., whether or not the petitioner would be subjected to mob violence if returned) were beyond the scope of inquiry in federal habeas corpus.[9] In the early 1940's, however, the wall was cracked. Commonwealth ex rel. Mattox v. Superintendent of County Prison, 152 Pa.Super. 167, 31 A.2d 576 (1943),[10] Johnson v. Dye, 175 F.2d 250

---

7. Mich.Stat.Ann. Sec. 28.1285(1) et seq.

8. See, representations of her counsel to Arizona trial court, infra.

9. Marbles v. Creecy, 215 U.S. 63, 30 S.Ct. 32, 54 L.Ed. 92 (1909).

10. Discussed in 53 Yale L.J. 359, "Scope of a Habeas Corpus Hearing on Interstate Extradition of Criminals".

(CA 3, 1949), rev'd per curiam, 338 U.S. 864, 70 S.Ct. 146, 94 L.Ed. 530, reh. den. 338 U.S. 896, 70 S.Ct. 238, 94 L.Ed. 551 (1949), and their progeny [11] followed, all culminating in the leading case of Sweeney v. Woodall, 334 U.S. 86, 73 S.Ct. 139, 97 L.Ed. 114, reh. den. 344 U.S. 916, 73 S.Ct. 332, 97 L.Ed. 706 (1952), referred to hereinafter as *Sweeney*. Before leaving the pre-*Sweeney* cases we will observe (and this observation applies equally to the post-*Sweeney* cases) that rarely have we read a series of cases so lacking in unanimity as to reasoning, so productive of a drumfire of dissents (e. g., dissent of Bazelon, J., in Johnson v. Matthews, 86 U.S.App.D.C. 376, 182 F.2d 677 (1950)) Opinion of O'Connell, J., in Johnson v. Dye, 175 F.2d 250 (CA 3, 1949). The reason is not difficult to fathom. In each case there has been a conflict between the demands of simple humanity and the demands of comity and federalism.

*Sweeney* involved two escapees from an Alabama chain gang. They alleged a variety of wrongs, such as "frequent beatings with a nine pound strap with five prongs, at the end of each prong was a silver half dollar", subjection to the "gravel treatment" as well as other alleged abuses and indignities.[12] Both Ohio, the asylum state, and Georgia (Amicus Curiae) urged that Woodall did not claim he could not get a hearing in Alabama, and, assuming the availability of the Alabama remedy, the court held that considerations fundamental to our federal system, required that Woodall make his allegations of unconstitutionality "in the courts of Alabama, where all parties may be heard, where all pertinent testimony will be readily available and where suitable relief, if any is necessary, may be fashioned." [13]

If the *Sweeney* case stood alone this court would be precluded from granting any relief in the matter before us. True, it might be argued [14] that *Sweeney* is really grounded upon a deficiency in the proofs offered, namely, that *Woodall* made "no showing that relief is unavailable to him in the courts of Alabama" [15] and thus does not present the issue before us of irreparable injury, carefully pleaded and properly established, going to the point that the in absentia trial of a defendant voluntarily absent has been held constitutionally valid by the highest court of the demanding state, State v. Cumbo, 96 Ariz. 385, 396 P.2d 11,[16] and that there is no state remedy available. From this it would follow that *Sweeney*, properly read, does not foreclose a broad scale inquiry (going to the validity of the proceedings in the demanding state) upon a proper showing. This construction of the *Sweeney* case, however, is not in my opinion justified. Rather it would seem to be a square holding that the interests of federalism transcend the constitutional rights of the individual.

The question squarely posed, then, is this: At this time, does *Sweeney* still control the situation before us? There is much to be said on the ground that it does. It has never been squarely overruled. The Federal-State structure is as delicately balanced today as it was of *Sweeney's* date. The intrusion of a lower and foreign federal court into a situation sanctioned and approved by the high-

---

11. See, United States ex rel. Jackson v. Ruthazer, 181 F.2d 588 (2d Cir.), cert. den. 339 U.S. 980, 70 S.Ct. 1027, 94 L.Ed. 1384 (1950); Johnson v. Matthews, 86 U.S.App.D.C. 376, 182 F.2d 677, cert. den. 340 U.S. 828, 71 S.Ct. 65, 95 L.Ed. 608 (1950); Davis v. O'Connell, 185 F.2d 513 (8th Cir. 1950); Ross v. Middlebrooks, 188 F.2d 308 (9th Cir. 1951).

12. Petition for Writ, p. 5, Records and Briefs, Supreme Court.

13. Sweeney v. Woodall, 344 U.S. 86, 90, 73 S.Ct. 139, 140, 97 L.Ed. 114 (1952).

14. See, Musmanno, J., dissenting in Commonwealth ex rel. Brown v. Baldi, 378 Pa. 504, 106 A.2d 777, 780.

15. Sweeney, supra, 344 U.S. p. 89, 73 S.Ct. p. 140.

16. Amicus informs us that District Judge C. A. Muecke held on the basis of the record before his court that defendant did not voluntarily absent himself from the courtroom and ordered his release, conditional upon his re-trial, Civil No. 6058–Phx, March 10, 1967.

est legal authority of a sovereign state is not conducive to the harmony desirable between our often conflicting jurisdictions. Furthermore, we put to one side, without discussion, other, more technical considerations, such as, for example, the fact that extradition is a federally established procedure, as to which it might be assumed, the federal courts have a peculiar responsibility. Surely such considerations were as obvious at the time of *Sweeney* as today. We must return, then, to the conflict between "the fundamental considerations of humanity and decency which are reflected in the Bill of Rights" and the constitutional purpose of "promoting efficiency and comity between states".[17] Is *Sweeney* still the law?

It is at once apparent that a different climate exists today with respect to Fourteenth Amendments problems. No useful purpose would be served by attempting to chart, precisely, the course of the Great Writ down through the years. It has been similar to the course of a sailing vessel rounding the Horn. There has been much yawing and tacking. At all times, though, a clearly discernible objective has been followed which I take to be the supply of a remedy for procedures so grossly offensive to the current mores as to make injury subject to them offensive to due process. If we are correct in this analysis it remains to examine *Sweeney's* holding in the light of today's interpretations of constitutional principles.

Much constitutional history has been written since Sweeney. The names of the landmark cases since that time are legion. Their holdings cast new light upon Fourteenth Amendment problems. To cite but a few we have had In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); Brookhart v. Janis, 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966); Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Pointer v. State of Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); Malloy v. Hogen, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); Douglas v. People of State of California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963); Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The catalog is not here exhausted. It is clear that the Supreme Court "within the last half-century has dealt increasingly with state administration of justice in constitutional terms".[18]

But most important for decision in this case, is Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). This case, in our judgment, was intended to strike down much of the prior law accommodating state criminal process to the doctrine of federalism. As the Court put it, "To the extent that any decisions of this Court may be read to suggest a standard of discretion in federal habeas corpus different from what we lay down today, such decisions shall be deemed overruled to the extent of any inconsistency".[19]

We approach the problem, then, only slightly enlightened by the pre-*Noia* holdings and go directly to the argument that irreparable future injury faces the Petitioner if returned to Arizona, such injury arising out of a past and alleged flagrant deprivation of constitutional rights. Arizona, by Amicus, argues to us that Petitioner "has not tested the validity of that conviction by any of the state procedures presently available to her, nor has she shown this court any reason to seriously question the validity of the conviction".

██ We have decided, supra, that it is our duty in these proceedings to review the validity of the in absentia trial. In support of its validity Counsel for Arizona relies upon such cases as Diaz v. United States, 223 U.S. 442, 32 S.Ct. 250,

17. Bazelon, C. J., dissenting in Johnson v. Matthews, 86 U.S.App.D.C. 376, 182 F.2d 677, 685, 1950, cert. den. 340 U.S. 828, 71 S.Ct. 65, 95 L.Ed. 608 (1950).

18. Brennan, J., in The Bill of Rights and the States, 36 N.Y.U.L.R. 761, 774 (1961).

19. 372 U.S. at 439, n. 44, 83 S.Ct. at 849.

56 L.Ed. 500 (1912), and, Pearson v. United States, 117 U.S.App.D.C. 52, 325 F.2d 625 (1963). *Diaz* involved a situation wherein "on two occasions, in the latter part of the trial, he [defendant] voluntarily absented himself, and sent to the court a message expressly consenting that the trial proceed in his absence, which was done". *Pearson* involved an aggressive and belligerent defendant who insisted upon returning "to the bullpen" during the trial. In neither case was there held to be a violation of constitutional principles. We need not pass here upon the problem presented occasionally when a criminal defendant seeks to make of his trial a carnival of contempt. Certainly the Court need not await his grace. Nor need we pass upon an affirmative waiver of a constitutional right made personally by a criminal defendant, though in such situation the utmost care must be employed. Nor, we will note at this point, do we have the situation referred to in Rule 43, Federal Rules Crim. Procedure, since the trial was not "commenced in [her] presence". In fact, none of it was so conducted. The cases cited are not in point. This case relies upon the provisions of Arizona's Rule 231, 17 A.R.S., hereinabove set forth, authorizing an in absentia trial "If the defendant is voluntarily absent".

The word "voluntarily" in this rule may have various meanings. We look to the Arizona court for its construction in that state, in the light of their experience and their familiarity with the case and statutory law governing the construction of this crucial word. I find, in the transcripts before me,[20] the following:

"MR. D'ANTONIO: Your Honor, I wish to state to the Court that since I have been retained by Ernestine W. Hunt as her counsel, I have not had the opportunity as yet, No. 1, to see her; No. 2, to talk with her and discuss her case with her; No. 3, to discuss with her my possible defenses; No. 4, to discuss with her whether or not she could testify on her own behalf and offer evidence on her own behalf; whether or not she could call witnesses on our own behalf; whether or not she could assist me insofar as interrogating or calling witnesses who would benefit her in this case. Under those circumstances, your Honor, I believe that an Order compelling her to go to trial, in the light of the record in this case, in the light of the fact that she has had and probably does have a form of physical or mental illness which prevents her from assisting her counsel, amounts to a denial of her rights under the 6th Amendment."

The following also appears:

"THE COURT: How long have you been the counsel for Mrs. Hunt?

"MR. D'ANTONIO: I would say that the moving papers in our office indicate that we have been counsel for perhaps ten months, perhaps longer.

"THE COURT: During that time have you gone back to attempt to talk with her?

"MR. D'ANTONIO: No, your Honor, I have not gone back to the State of Michigan.

"THE COURT: Have you asked her to come back here?

"MR. D'ANTONIO: I have on repeated occasions asked her to come out here, and we have written letters begging, in fact, begging for at least three or four days' time in which to help prepare the case.

"THE COURT: And she did not come, is that correct?

"MR. D'ANTONIO: On certain occasions—on one occasion she was actually hysterical. There was no communication, within the normal meaning of communication, between an attorney and client. There was no way to confer. There was at one time doubt in my mind that Mrs. Hunt even recognized that I

20. Case No. A–13985, State of Arizona v. Maurice E. Hunt, Ernestine W. Hunt, date April 25, 1967.

was her attorney to help and assist her. She was hostile to me, as if I were an associate of Mr. Weiss.

"THE COURT: This is over the telephone you are talking about?

"MR. D'ANTONIO: This is over the telephone and other mediums of communication. I have talked to attorneys who represented her in Michigan who have advised me of this fact; that is to say, they have told me, 'Mr. D'Antonio, Mrs. Hunt does not even recognize you as an attorney who is retained to assist her in her defense. She has somewhat in her mind associated you with the prosecution. She is unable, therefore, to communicate with you on any normal or confidential matter.'

"What I'm telling the Court is simply this: I consider myself a reasonably competent attorney, but I don't consider myself so able or so gifted that I am able to proceed with the defense of this case without my client being present in the first instance, or without even knowing what my client intended that I should do on her behalf."

Despite the foregoing, trial was commenced on said date, April 25, 1967, in absentia, pursuant to Rule 231. The Minute Entries contain the following:

"Mr. D'Antonio requests that the record show that during the entire trial Ernestine Hunt was not in the Courtroom."

As noted, upon such representations, *so made*, trial in absentia *was* ordered and proceeded forthwith. We can only conclude that a defendant is "voluntarily" absent under Arizona's interpretation of Rule 231, and has waived his constitutional rights even though such defendant, specifically by counsel, requests continuance of the trial,[21] protests its conduct, denies waiver of constitution-

al rights, and asserts physical and mental inability to be present or to assist counsel.

There is no doubt that "whenever his [the defendant's] presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge" Snyder v. Com. of Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934), a defendant has the right to be present at his trial. The Sixth Amendment right to confrontation of witnesses is also specifically a part of the Fourteenth Amendment as a result of Pointer v. State of Texas, 380 U.S. 400, 85 S.Ct. 1065 (1965), wherein the Supreme Court stated:

"We hold today that the Sixth Amendment's right of an accused to confront the witnesses against him is likewise a fundamental right and is made obligatory on the States by the Fourteenth Amendment. It cannot seriously be doubted at this late date that the right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him". (380 U.S. at 403–404, 85 S.Ct. at 1068)"

The most recent re-affirmation of this principle is found in the case of Brookhart v. Janis, 384 U.S. 1, 86 S.Ct. 1245 (1966). In this case Brookhart's lawyer apparently agreed to what is called a "prima facie trial" under Ohio practice, in which, though the defendant does not plead guilty, he remains passive while a prima facie case is presented by the prosecution, after which the court enters a judgment based on the sufficiency of the evidence as prima facie evidence, and sentences the defendant if the judgment is one of conviction. The Supreme Court held that absent a constitutionally valid waiver, the proceeding denied Brookhart due process of law. The Court stated in part:

"In this Court respondent admits that:

'(I)f there was here a denial of cross-examination without waiver,

---

21. "Mr. D'Antonio: Your Honor, the nature of the written motion filed this morning is a request that this Court, in the exercise of its own discretion, continue the trial as to the Defendant, Ernestine Hunt."

it would be constitutional error of the first magnitude and no amount of showing of want of error would cure it.'

This concession is properly made. The Sixth Amendment provides that: 'In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *.' And in Pointer v. State of Texas, 380 U.S. 400, 406, 85 S.Ct. 1065, [1069,] 13 L.Ed.2d 923, we held that the confrontation guarantee of the Sixth Amendment including the right of cross-examination "is 'to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment.' * * * It follows that unless petitioner did actually waive his right to be confronted with and to cross-examine these witnesses, his federally guaranteed constitutional rights have been denied in two ways. In the first place he was denied the right to cross-examine at all any witnesses who testified against him. In the second place there was introduced as evidence against him an alleged confession, made out of court by one of his co-defendants, Mitchell, who did not testify in court, and petitioner was therefore denied any opportunity whatever to confront and cross-examine the witness who made this very damaging statement. * * * " (384 U.S. at 3–4, 86 S.Ct. at 1246)

■ It is abundantly clear that the in absentia trial proceedings violated petitioner's right under Snyder v. Com. of Massachusetts to be present whenever her presence had a "relation, reasonably substantial, to the fulness of (her) opportunity to defend against the charge," and her rights under *Pointer* and *Brookhart* to confront and cross-examine the witnesses against her. It is also evident, as indicated by the protests lodged by Mrs. Hunt's Arizona attorney of record during the Pima County proceedings April 25, 1967 (transcript at pp. 7–11), that she was denied the effective assistance of counsel under Gideon v. Wain-

wright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). It is our conclusion upon these facts, and the law applicable thereto, as hereinabove set forth, that there was no valid waiver by Petitioner of her constitutional rights, and that the Arizona rule as construed is patently offensive to constitutional principles. It violated Petitioner's right to be present at her criminal trial, her rights of confrontation and cross-examination, and to the aid of counsel.

Counsel for Arizona denies that irreparable injury awaits her if she is returned to Arizona to test these procedures in the courts of that state. Petitioner, however, asserts (on the basis of her prior appeal, State v. Hunt, 2 Ariz.App. 6, 406 P.2d 208 (1965)) that it will take approximately two years to have her case ruled upon. Amicus denies. With reported examples from current cases, it is argued to us that "The average elapsed time from filing of notice to decision is approximately seven and one-third months. Decision has been delayed in cases where a divided court has sought concensus, but where appellant's counsel is diligent, the Arizona appeal courts usually render speedy justice."

The meaning of such words as "average", "delayed", "concensus", "diligent", "usually" and "speedy" is not precise. An additional element of doubt is injected by the fact that much may depend upon the construction given the instruments filed, e. g., In re Acosta, 97 Ariz. 333, 400 P.2d 328, where a petitioner's application for habeas corpus was "treated as" a motion for permission to file a delayed appeal under Rule 16(a) of the Rules of the Supreme Court, 17 A.R.S.

■ It is our conclusion that no one, either here or in Arizona, can say with any certainty how long it will take to exhaust Arizona's available procedures. It may be only a matter of months (no one asserts less) or a matter of years. In the meantime Petitioner is a convicted criminal and her degree of freedom, during the exhaustion period, is likewise problematical. Testimony was offered to the effect that under applicable Arizona rules (the trial court having deter-

mined that she was voluntarily absent, having ordered her arrest and having postponed sentencing until her return to Arizona) she will not be eligible for bail.[22]  Such is our conclusion.  But whether incarcerated, or on bail, she is subjected to restraint and supervision. Due to her conviction, in her in absentia trial, she will not have freedom of action enjoyed by a citizen not so beclouded. Of this phase of the case it is clear that she faces injury that is irreparable upon her return to Arizona.

It remains to consider remedy.  Under the applicable statutes it is this Court's duty to dispose of the petitioner before us "as law and justice require".[23]  We have no desire to make this state a haven for recalcitrant defendants.  Petitioner should be fairly tried for her alleged offense.  At the same time we are persuaded that her return to Arizona to face the certainty of sentence and the appeals following, bearing in mind that she must exhaust the state's remedies as a condition precedent for federal habeas corpus in Arizona, would subject her to irreparable harm.  If we were forced to choose between avoidance of punishment entirely, no matter how richly deserved, and a deprivation of constitutional rights, we would choose, with Judge Bazelon,[24] the former.  This is a matter of relative values.  No scale is perfect, no dogma the true faith.  But in my judgment the Bill of Rights requires no less than the elevation of the individual, no matter how miserable, over the competing demands of comity and the judicial deference known as federalism.

But we are forced upon no such Procrustean bed as between the choices above stated.  For solution we turn to federal district court precedent in the international extradition cases.  We gather their teachings to be that in such cases, where a foreign country seeks the return of one of its nationals after a trial in absentia,

federal district courts have refused to acknowledge the judgment of conviction as of legal value and have treated the case as one in which criminal trial is still pending.  Return is then authorized, solely for trial, and under the doctrine of international law controlling such extradition, the demanding sovereign must afford the defendant a complete trial on the original charges.  This trial must meet the requirements of international due process, and failure to so protect the rights of the defendant constitutes a breach of international law.  Gallina v. Fraser, 177 F.Supp. 856 (D.C.Conn. 1959); Ex parte La Mantia, 206 F. 330 (D.C., S.D.N.Y.1913); Ex parte Fudera, 162 F. 591 (C.C.,S.D.N.Y.1908).

Thus our ruling: With great deference to, and respect for, the Courts of our sister state, if the State of Arizona certifies to this Court that the Petitioner can and will receive an expeditious trial under the Federal constitutionally applicable principles as hereinabove outlined, Petitioner's return upon a proper requisition will not be prevented by this Court upon the showings here made.  Failing such certification and requisition within a reasonable time the writ shall be granted and the Petitioner's discharge ordered. The writ, as of today, is thus granted, conditioned as above, and the Petitioner shall be admitted to bail.

Under the view we have taken of this case we need not decide whether there has been independent Michigan state action, executive and judicial, depriving Petitioner of due process under the Fourteenth Amendment, because of Michigan's honoring of Arizona's demand, with knowledge that in so doing it was ratifying and confirming, implementing and lending its official aid to, Arizona's efforts to sentence pursuant to a trial in absentia.

It is so ordered.

---

22. Rule 358, Arizona Rules of Criminal Procedure, 17 A.R.S., provides in substance that, under these circumstances, a defendant will not be eligible for bail unless defendant has a proper excuse for having been in default of the previous bail, with respect to whether the Arizona court has heretofore found that Petitioner was voluntarily absent.

23. 28 U.S.C. § 2243.

24. Dissenting in Johnson v. Matthews, 86 U.S.App.D.C. 376, 182 F.2d 677, 684 (1950).